IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | |
| | WDPA DOCKET NO. 2:09-MC-00162-DWA |
| LE-NATURE'S INC. COMMERCIAL LITIGATION | MDL DOCKET NO. 2021 |

| | |
|---|---|
| MB FINANCIAL BANK, N.A., | |
| Plaintiff, | Civil Action No.:  2:09-cv-469-DWA |
| v. | |
| MARSHALL INVESTMENTS CORPORATION, MARSHALL FINANCIAL, INC., THE MARSHALL GROUP, MARSHALL BANKFIRST CORP., CIT GROUP/EQUIPMENT FINANCING, INC., KRONES, INC.,  KRONES AKTIENGESELLSCHAFT, VOLKER KRONSEDER, and HEINZ SOMMER, Defendants. | |
| (N.D. IL Civil Action No. 08-cv-2138, transferred to MDL as of April 9, 2009) | |

**THIRD AMENDED
COMPLAINT OF MB FINANCIAL BANK, N.A.**

Plaintiff, MB FINANCIAL BANK, N.A. ("MB"), successor in interest to Oak Brook Bank, by its attorneys, for its Third Amended Complaint against Defendants, Marshall Investments Corporation, Marshall Financial, Inc., The Marshall Group and Marshall BankFirst Corp. (collectively, the "Marshall Entities"), CIT Group/Equipment Financing, Inc. ("CIT"), Krones, Inc. ("Krones U.S."), Krones Aktiengesellschaft ("Krones AG," and together with Krones U.S., "Krones"), Volker Kronseder ("Kronseder"), and Heinz Sommer ("Sommer"), states the following:

## INTRODUCTION

1.     This lawsuit arises out of the fraudulent misrepresentations and material omissions made by CIT and the Marshall Entities in connection with the solicitation and inducement of MB's investment and participation in an illegal scheme involving equipment lease financing being provided to a beverage manufacturer/bottling company called Le-Nature's, Inc. ("Le Natures").  The purported purpose of the financing was to enable Le Natures to lease, and potentially buy, four lines of bottling equipment that would be used in its new plant in Phoenix, Arizona (the "Phoenix Facility").  The only collateral that would secure the financing was the equipment itself, which CIT and the Marshall Entities represented had a cost of approximately $189 million.

2.     In the course of promoting and marketing the opportunity to participate in the lease financing arrangement (the "Le Natures Opportunity"), CIT and the Marshall Entities trumpeted Le Natures' strong financial strength and performance through various telephone solicitations, facsimile transmissions, electronic mails, face-to-face meetings, and the distribution of a jointly prepared offering memorandum.

3.     What CIT and the Marshall Entities knew, but failed to disclose in any of the foregoing oral and written communications with MB, was that the true cost and value of the equipment itself was far less than the amount being financed to Le Natures or, at minimum, the actual cost of the equipment was very much in doubt.  In March 2005, prior to MB and other participants acquiring an interest in the Le Natures lease financing, both CIT and the Marshall Entities received information from the same informant (a former agent of Krones) that they were being defrauded by Le Natures and Krones by providing financing to Le Natures in an amount that was twice the actual cost of the equipment.  Indeed, CIT and the Marshall Entities were

informed <u>before the deal closed</u> that the actual cost of all four lines of bottling equipment was approximately $91 million, rather than $189 million.

4.      So as to benefit their own financial situation and/or reduce their own risk, CIT and the Marshall Entities intentionally or, at a minimum, negligently failed to disclose the existence of this material information to MB or to any of the other potential participating lenders. The Marshall Entities were only marketing the deal and were not investing any of their own money.  CIT had already invested approximately $25 million in Le Natures when they became aware of the alleged fraud, and chose to proceed anyway by soliciting other potential participants to finance more than $100 million additional dollars.

5.      Not only did CIT and the Marshall Entities receive word of the potential fraud prior to closing the deal, but they conducted an investigation into the alleged fraud – an investigation that included multiple meetings and telephone conversations with Le Natures and with high ranking executives (such as Sommer and Kronseder) at Krones, the vendor/manufacturer of the bottling equipment.  As part of their supposed investigation, CIT and the Marshall Entities also reviewed numerous documents provided by Le Natures and Krones. CIT and the Marshall Entities, however, also kept this investigation concealed and intentionally chose not to disclose any of this material information to MB or to other potential participants in the Le Natures Opportunity.

6.      In light of both CIT's and the Marshall Entities' superior knowledge of Le Natures, MB necessarily relied on the flow of information being disseminated by CIT and the Marshall Entities and the ***absence*** of any "red flags" that would deter MB from acquiring a participation interest.  CIT and the Marshall Entities undoubtedly knew that if they disclosed the alleged fraud, MB and others would not invest in Le Natures.

7.      In the late fall of 2006, an involuntary bankruptcy petition was filed against Le Natures.  During the course of the bankruptcy proceedings, it was discovered that the true cost of the equipment was approximately $90 - $100 million and that Le Natures' sales revenues had also been grossly and fraudulently overstated.   The equipment securing the financing was liquidated for approximately $30 million, as the allegations of fraud made by the informant to the Marshall Entities and CIT were indeed accurate.   CIT's and the Marshall Entities' decision to conceal material information was intentional and reckless or, at a minimum, negligent.   It was also part of a conspiracy designed to aid the larger fraudulent scheme being perpetrated by Le Natures and Krones – a scheme being directed at the unknowing participants in the Le Natures Opportunity, including MB.   CIT and the Marshall Entities substantially assisted this fraudulent scheme by making sure that the material information about the "tip" and other clear signs or "badges" of fraud were not revealed to potential participants, such as MB.   While CIT substantially reduced its exposure and risk by continuing to sell participation interests and the Marshall Entities profited from the Le Natures financing through the generation of fees, MB lost almost all of its $10 million investment.

8.      It is clear that through their fraudulent and negligent conduct, CIT and the Marshall Entities quickly became an integral part of and substantially assisted in the fraudulent scheme orchestrated and perpetrated between 2004 and 2006 by Krones, Sommer, Kronseder and Le Natures, among others.  With the substantial and knowing assistance of CIT and the Marshall Entities, among others, Le Natures successfully raised capital over a prolonged period of years from numerous investors through an elaborate scheme in which it created the illusion of a highly profitable business by falsifying and purposefully overstating its revenues and profits and intentionally understating its debt.

9.     Krones directly and knowingly participated in the scheme by inflating the costs of the bottling equipment sold to CIT (and subsequently leased to Le Natures) so as to obtain significant overpayments from the syndicate and other lenders, such as MB.   Once Krones received payment from the syndicate (and other lenders), it retained sufficient amounts to cover the costs of the equipment and – pursuant to certain written "excess payment" agreements with Le Natures – diverted the excess funds to Le Natures.   Through this kickback scheme, Le Natures ultimately received approximately $118 million from Krones.   In turn, Le Natures intended to use the excess funds to purchase additional equipment from Krones to be installed at Le Natures' existing Latrobe, Pennsylvania facility, as well as at another planned facility to be built in Jacksonville, Florida.

10.     CIT and the Marshall Entities substantially assisted this fraudulent scheme by soliciting MB and other lenders to finance the equipment (at the inflated price), concealing the material information they learned about the alleged fraud and knowingly making excess payments to Le Natures through Krones.

11.     As a result of the misrepresentations and omissions of CIT and the Marshall Entities, as well as the fraudulent scheme perpetrated by Krones, Sommer, Kronseder and Le Natures (with assistance from CIT and the Marshall Entities), MB wired $5 million to the Marshall Entities, who in turn sent that money to CIT, who in turn wired those funds to Krones (after deducting undisclosed fees to be shared between CIT and the Marshall Entities).   MB also wired closed to $5 million directly to CIT, who again wired those funds to Krones after deducting certain fees for itself.   Krones, in turn, kicked back to Le Natures a portion of the funds it received from MB and the other participating lenders.   In the end, MB was for all intents and purposes a direct investor in the bottling equipment purchased from Krones and was directly

**THE PARTIES**

12.     Plaintiff, MB Financial Bank, N.A., is a national banking association with its principal place of business in Chicago, Illinois.  On or about August 25, 2006, MB acquired the assets and liabilities of Oak Brook Bank ("Oak Brook") and is a successor in interest to Oak Brook.

13.     Defendant, Krones AG, is incorporated under the laws of Germany and maintains its principal place of business in Neutraubling, Germany.  Krones AG is one of the world's leading manufacturers of packaging and bottling line systems, beer brew house systems, as well as related IT solutions and warehouse logistics systems.  Krones AG conducts business in the United States both directly and through Krones U.S. (its agent and subsidiary).  In fact, Krones AG operates approximately twelve (12) facilities in the United States used to sell and/or install its products, including the bottling equipment purchased as part of the Le Natures Opportunity, and further operates a training facility and conducts training seminars in the United States. Krones AG, at all relevant times, was intimately involved in the design, manufacturing, marketing and installation of the equipment in the Phoenix, Arizona facility.

14.     Defendant, Krones U.S., a wholly-owned subsidiary of Krones AG, is incorporated under the laws of the State of Wisconsin and is headquartered in Franklin, Wisconsin.  Krones U.S., which shares certain officers and directors with Krones AG, exists predominantly to promote the sale and distribution of its parent's products and services in the United States.  Indeed, Krones U.S. promotes itself as the "United States headquarters" for

Krones A.G.  Krones U.S. is registered to do business in Illinois and maintains a registered agent in Illinois.

15.     Defendant, Volker Kronseder, believed to be a resident of Germany, serves as the current President and a director of Krones U.S. and is also the Chairman and Chief Executive Officer of Krones AG.  On information and belief, Kronseder regularly conducts business in the United States, including overseeing Krones U.S.'s operations, negotiating contracts with prospective and existing customers, attending beverage industry trade shows, and participating in other marketing activities on behalf of Krones U.S. and Krones AG.  During the lease financing process, Kroseder met with representatives of CIT and Le Natures in the United States to facilitate CIT's purchase of the bottling equipment at issue.  One such meeting occurred in late 2004 at a dinner in Chicago hosted by Krones to honor Le Natures and its CEO – Gregory Podlucky.  During the dinner, CIT's efforts to finance the purchase of the equipment were through other lenders discussed.

16.     Defendant, Heinz Sommer, is a resident and citizen of Pennsylvania.  During all times relevant to this litigation, Sommer conducted business throughout the United States, including in Illinois.  Sommer is the former President of Krones U.S. and held that position during the commencement of the fraudulent activities at issue in this litigation.  Sommer also attended the dinner in Chicago discussed in paragraph 15 above.

17.     Defendant, CIT Group/Equipment Financing, Inc., is a Delaware corporation with its principal place of business in Livingston, New Jersey.  At all times relevant to this litigation, CIT was doing business in Illinois.  In fact, CIT is registered to do business in Illinois, maintains a registered agent in Illinois and has filed its most recent Annual Report with the State of Illinois in connection with this registration.

18.     Defendant, The Marshall Group, Inc. ("Marshall Group"), is a privately held corporation incorporated under the laws of the State of Minnesota.  According to its own website, the Marshall Group "provides loan participation and syndication opportunities to an extensive network of commercial banks and financial institutions throughout the United States." The Marshall Group touts how "[l]ending institutions of all sizes gain access to thoroughly researched transactions from a variety of industries and locations."

19.     CIT and the Marshall Group purported to be the authors/sponsors of the Confidential Information Memorandum (the "Information Memorandum") provided to MB and the other potential participants in the equipment lease financing being provided to Le Natures. CIT, in particular, was listed as the "Administrative Agent, Co-Arranger and Co-Lessor" in connection with the Master Synthetic Lease Financing arrangement with Le Natures (the "Lease Financing").  CIT and the Marshall Entities were represented to be acting jointly and on behalf of each other, and as "Agents" on behalf of MB and the other participating lenders.  At all relevant times, CIT, through its agents and employees, was doing business in Illinois.

20.     According to the front page of the Information Memorandum, the Marshall Group has offices in Chicago, Illinois, among other locations.  At all times relevant to this litigation, the Marshall Group, through its agents and employees, was doing business in Illinois.

21.     Defendant, Marshall BankFirst Corp. ("Marshall BankFirst"), is an affiliate of the Marshall Group and a bank holding company headquartered in Minneapolis, Minnesota. Through its affiliate, the Marshall Group, and Wiley H. Sharp, III (who was at all relevant times an agent, representative or employee of BankFirst), Marshall BankFirst was doing business in Illinois during all times relevant to this litigation.

22.     Defendant, Marshall Financial, Inc. ("Marshall Financial"), is a subsidiary of the Marshall Group and a privately held corporation incorporated under the laws of the State of Delaware.  In the Information Memorandum provided to MB and other potential participants, Marshall Financial is listed as the "Co-Arranger and Syndication Agent" in connection with the equipment lease financing to Le Natures.  In that capacity, Marshall Financial was responsible for "directing and managing the marketing of the financing, including running the order book." Marshall Financial, as described more fully herein, also entered into the original Master Lease Agreement with Le Natures.  At all times relevant to this litigation, Marshall Financial was doing business in Illinois.

23.     Defendant, Marshall Investments Corporation ("Marshall Investments"), is a subsidiary of the Marshall Group, and is a Delaware corporation with its principal place of business in Minneapolis, Minnesota.  According to the Information Memorandum, Marshall Investments served as a "Co-Lessor" for the equipment lease financing by receiving a "pro-rata assignment of the Lessor's interest in the transaction on behalf of Participating Lessors."  As described more fully herein, Marshall Investments entered into the participation agreement with MB and, at all times relevant to this litigation, did business in Illinois.

24.     Upon information and belief, Marshall Financial, Marshall Investments, the Marshall Group and Marshall BankFirst, during all times relevant to this litigation, shared employees and officers and acted as one single entity.  The employees, letterhead and company names were used interchangeably in meetings, communications and representations.  The Information Memorandum itself serves as an example of how these entities acted interchangeably with the Marshall Group logo on the front page of the Information

Memorandum, with Marshall Financial acting as the "Co-Arranger and Syndication Agent" and Marshall Investments acting as the "Co-Lessor."

25.     At bottom, the Marshall Entities are nothing more than a tangled web of corporate entities that have been merged, spun off, merged again and partitioned off in order to avoid civil liability for their bad acts.   The Marshall Entities, however, cannot escape liability for their conduct through the various corporate labels they use.   In instances such as these, the law provides a remedy through the doctrines of piercing the corporate veil and/or alter ego.

26.     Specifically, Marshall Financial, Marshall Investments, The Marshall Group, and Marshall BankFirst were comprised of employees who were shared among the various entities and were, in effect, one single entity; the only distinction being the different names. The companies were run by and equally shared the same Chief Executive Officer and other common officers and used such employees, letterhead, and company names interchangeably in meetings, communications and representations.   Moreover, in violation of federal law, the Marshall Entities shared and commingled money without a proper business purpose for doing so.

27.     Further, each of the Marshall Entities (and their employees) acted, in all relevant aspects and times, as actual or apparent agents for the others.  Upon information and belief, The Marshall Group and then Marshall BankFirst retained the right to control the Marshall Entities with respect to the servicing, marketing and operations of the lease participation agreements at issue.   Thus, Marshall BankFirst, The Marshall Group, Marshall Investments, Marshall Financial, and any of their agents, representatives, officers, directors, employees or other individuals or entities acting on behalf of any of the Marshall Entities are referred to collectively as the "Marshall Entities."

## JURISDICTION AND VENUE

28.     The Northern District of Illinois has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1367 as it involves a federal question.  Jurisdiction is also proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and this civil action is between citizens of different states.

29.     The Northern District of Illinois has personal jurisdiction over Krones U.S., Krones AG, Kronseder and Sommer pursuant to 18 U.S.C. § 1965, by virtue of their knowing and active participation in the Le Natures fraudulent scheme which intentionally targeted numerous financial institutions located in the United States, including Illinois.  In particular, Krones U.S. (who is registered to do business in Illinois and, in fact, conducts business in Illinois), as well as Sommer, are subject to personal jurisdiction in the Northern District of Illinois pursuant to the RICO Act's nationwide jurisdiction and venue provision.  Krones U.S. and Krones AG are also subject to personal jurisdiction in the Northern District of Illinois pursuant to the Illinois Long-Arm Statute.  735 ILCS 5/2-209.  Kronseder is likewise subject to the personal jurisdiction of the Northern District of Illinois as his conduct in furtherance of the Le Natures fraud took place in Illinois and, as described below, caused foreseeable and substantial harm to MB's interests in Illinois.

30.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Illinois.

# FACTUAL BACKGROUND

## *Le Natures' Business Operations and Purported Need for Financing Its Growth*

31.     Le Natures (f/k/a Genesis, Inc. and Global Beverages Systems, Inc.) was founded in 1992 and was in the business of developing, producing and marketing non-carbonated flavored beverages under the Le Natures brand name.  Between 1998 and 2004, Le Natures allegedly experienced explosive growth as a result of its purported ongoing product development initiatives, continual sales and marketing efforts, and substantial investments in fixed assets.

32.     In early 2004, and in response to the purported demand for its products, Le Natures began constructing a new, $250 million, four-line bottling plant in Phoenix, Arizona.  Le Natures sought funding of approximately $190 million from investors for certain bottling equipment that it needed for the Phoenix Facility.

## *Le Natures and Krones Enter into the PMA*

33.     On or about August 27, 2004, Krones entered into a Project Management Agreement with Le Nature's (the "PMA") through which Krones agreed to manufacture and install four lines of bottling equipment in the Phoenix Facility for approximately $91 million. The parties agreed that Krones AG would manufacture the equipment subject to the PMA.

34.     Prior to the execution of the PMA, Krones had actual knowledge that the manufacturing and installation of the equipment would cost approximately $91 million.  For instance, on or about May 28, 2004, Sommer, the CEO of Krones U.S., sent an Equipment Purchase Agreement to Le Natures' COO (Jonathan Podlucky – the brother of Gregory Podlucky, Le Nature's founder and CEO) which indicated that the new facility would be located "in either Las Vegas, NV or Phoenix, AZ" and that the equipment would have a "purchase price [of] $91,077,095."  Likewise, on or about July 26, 2004, Roderick Daly of Krones sent Jonathan

Podlucky a document relating to the Phoenix Facility, showing a total price of $91,347,833 for the equipment (the price that was ultimately reflected in the actual PMA).

### *Le Natures Seeks Financing from CIT and The Marshall Entities*

35.     Prior to the execution of the PMA, Le Natures had approached CIT and the Marshall Entities, among other lenders with whom it had prior relationships, seeking financing for the four lines of bottling equipment (the "Leased Equipment") that Krones had agreed to manufacture for the Phoenix Facility.  Le Natures, with actual knowledge that Krones would manufacture and install the Leased Equipment for $91 million, represented to the potential investors that the Leased Equipment would cost approximately $184 million – more than twice its actual value.

36.     In a verified complaint filed in the United States District Court for the District of Arizona (the "CIT Arizona Complaint"), CIT explains how the equipment financing entailed an assignment to CIT and Marshall of certain Le Natures' rights and interests in the PMA.  On August 27, 2004, prior to executing Le Natures' written assignment of its rights to the PMA, CIT received a copy of a <u>fabricated</u> PMA between Krones and Le Natures (the "Fabricated PMA") that identified the total cost of the four bottling lines as $184.2 million—*not* the $91.3 million previously agreed to by Krones and Le Natures in the real PMA.  Like the real PMA, the Fabricated PMA specified that all work related to the bottling lines at the Phoenix Facility was to be performed by Krones and was included in the contract price.

37.     In January 2005, and in response to overtures made by Le Natures, CIT and the Marshall Entities agreed to secure financing for the Krones bottling equipment.  In general terms, CIT would purchase three of the four lines of the Leased Equipment from Krones for $145 million and, in turn, lease the equipment to Le Natures for use at its Phoenix Facility ("Le

Natures Equipment Lease").  CIT would then syndicate the financing for the Leased Equipment by selling participating interests in the Leased Equipment to various investors, including MB (collectively, the "Participants").  CIT and the Marshall Entities would serve as the administrative agents responsible for the administration of the Le Natures Equipment Lease in accordance with the terms of certain participation agreements entered with the Participants.

### *The Marketing of the Le Natures Opportunity and Solicitation of MB*

38.  In or around late 2004 and early 2005, the Marshall Entities and CIT began to market the Le Natures Opportunity to potential Participants.  As part of their marketing and solicitation efforts, CIT and the Marshall Entities authored and/or sponsored the Information Memorandum dated January 10, 2005.  According to the Information Memorandum, Le Natures "develop[ed], produce[d] and market[ed] all-natural, fully-pasteurized, preservative-free, non-carbonated alternative beverages under the *Le Natures* brand name."  As of January 10, 2005, Le Natures' primary manufacturing facility was in Latrobe, Pennsylvania, but the purpose of the Lease Financing was to enable Le Natures to lease, and potentially buy, "essential bottling and bottle-making equipment…in connection with the develop[ment] of [Le Natures'] new alternative beverage production facility in Phoenix, Arizona."

39.  According to the Information Memorandum, Le Natures had recently seen a "steady growth in shipments to western states,…and [g]rowing sales to customers in these areas and capacity limitations at the Latrobe plant" prompted Le Natures to develop a new four-line bottling plant in Phoenix, Arizona.

40.  Needing financing to acquire the bottling equipment for the Phoenix Facility, Le Natures turned to the Marshall Entities and CIT.  According to its website, CIT is an "industry

leader providing structured equipment financing and leasing solutions to middle-market companies throughout the United States."

41.     According to the Information Memorandum, CIT would serve as the "Administrative Agent," "Co-Arranger" (along with Marshall Financial) and "Co-Lessor" (along with Marshall Investments) in connection with the proposed Lease Financing.  CIT and the Marshall Entities were charged with providing Le Natures with up to $196 million of "progress payment and master synthetic lease financing" for Le Natures' Phoenix bottling plant of which CIT had previously committed approximately $46 million (and had already paid over half of that $46 million to Le Natures).  Through the Information Memorandum, Marshall and CIT were seeking up to an additional $144 million in additional financing for Le Natures, with those funds being advanced between November 15, 2004 and May 12, 2005.  In its capacity as "Administrative Agent," CIT was responsible for, among other things, billing and collecting all amounts due from Le Natures, remitting the pro rata share of such collections to the other lenders and lessors, holding title to the equipment serving as collateral for the loan and performing periodic inspections of the equipment.

42.     According to the Information Memorandum, the equipment to be financed included four separate bottling lines with an anticipated cost as follows:

Line 1……………..$46,003,281

Line 2 ……………$45,157,011

Line 3……………..$57,180,405

Line 4……………..$41,585,655

Total Original Cost…….$189,926.352.

43.     On information and belief, approximately $44 million of the cost of the equipment would be financed through a revolving line of credit between Le Natures and Wachovia Bank, N.A.   The remaining cost of the equipment – approximately $145 million – would be paid through the Lease Financing being promoted in the Information Memorandum.

44.     According to the Information Memorandum, Line 4 equipment was to be installed and fully functional by June 2005, Line 1 equipment was to be installed and fully functional by July 2005, Line 2 equipment was to be installed and fully functional by September 2005 and Line 3 equipment was to be installed and fully functional by November 2005.

***The Marshall Entities and CIT Solicit***
***MB's Participation in the Lease Financing***

45.     The Marshall Entities and CIT collectively marketed the Le Natures Opportunity to prospective Participants, including MB.   The Marshall Entities and CIT directed their marketing efforts by providing written materials and disseminating information to MB in the State of Illinois.

46.     The Marshall Entities, by and through their employees and agents, including Wiley H. Sharp III ("Sharp"), Todd Kennedy ("Kennedy") and Terrie Ferrise directly solicited MB's representatives in Illinois to acquire a participation interest in the Lease Financing.

47.     CIT, by and through its employees and agents, including Brad Liebold ("Liebold") and David Coit ("Coit"), also directly solicited MB's representatives in Illinois to acquire a participation interest in the Lease Financing.

48.     Beginning in late 2004 and early 2005, Sharp, Kennedy and Liebold, through phone calls, e-mails and facsimile transmissions, provided information both orally and in writing to MB touting the virtues of Le Natures and the significant benefits in the Le Natures Opportunity.   Indeed, Sharp represented to MB that he had direct access to Greg Podlucky (Le

Natures' Chief Executive Officer) and had extensive knowledge about Le Natures' financial condition and activities.

49.     Sharp and Liebold encouraged MB to invest in the Lease Financing because they allegedly knew that Le Natures was a very solid company.  The Marshall Entities and CIT jointly held conference calls with investors to discuss their knowledge of the deal.  A major focus of these calls was the value of the equipment being acquired and leased to Le Natures.  Sharp, in particular, claimed that the transaction had limited risk because of the ability to re-sell the equipment to one of Le Natures' competitors.  As set forth in the Information Memorandum, the equipment would purportedly retain its reasonable value.

50.     Further, with the intent to induce MB to enter into the Lease Financing, and based upon his alleged detailed knowledge, Sharp and CIT repeatedly assured MB that the representations made in the Information Memorandum were correct, including the representations regarding the substantial amounts of sales by Le Natures to accounts west of the Mississippi River.  The large amount of sales to accounts west of the Mississippi River was one of the principal reasons for the establishment of the Phoenix Facility.  Sharp further represented that his knowledge of Le Natures was an advantage to MB, and that MB should invest in the Lease Financing because it would be profitable and beneficial.

51.     CIT and the Marshall Entities held themselves out as having superior knowledge about the Le Natures Opportunity, and ensured that all information requests would flow through them.  Indeed, they would not allow MB or any other participant to contact Le Natures or Krones directly.  Still further, CIT in particular represented that its expertise and experience with these types of equipment leases would be an advantage to Participants and that it would administer the lease in a reasonable manner.  CIT further represented that the transaction had limited risk

because of the ability to liquidate the equipment and retain its reasonable value, and that there were no clear problems with the lease or the value of the proposed equipment.

### *The Structure of the Master Lease Agreement and Participation Agreements*

52.     The Marshall Entities and CIT structured the complex equipment Lease Financing as follows:  (1) Marshall Financial entered into a Master Lease Agreement with Le Natures dated April 15, 2005 (the "Master Lease Agreement"), pursuant to which the Leased Equipment would be leased to Le Natures; (2) The Master Lease Agreement was immediately assigned to CIT pursuant to an assignment dated April 15, 2005; (3) Immediately thereafter, CIT and Marshall Investments entered into an Assignment and Participation Agreement also dated April 15, 2005 (the "Assignment and Participation Agreement"), pursuant to which CIT assigned and sold a $30.5 million participation interest in the Master Lease Agreement to Marshall Investments; (4) Simultaneously with its execution of the Assignment and Participation Agreement, Marshall Investments entered into separate, but identical, participation agreements with eight different participating lessors, including MB.  As a result, none of the Marshall Entities had any money at risk in connection with the Lease Financing.

53.     MB was one of these participating lessors through Marshall Investments Corporation.  On April 15, 2005, MB acquired a $5 million participation interest in the Lease Financing directly from the Marshall Entities through their agent, Marshall Investments Corporation, pursuant to the terms of a written Participation Agreement (the "Bank/MIC Participation Agreement").  A copy of the Bank/MIC Participation Agreement is attached hereto as Exhibit A.

54.     Pursuant to the Bank/MIC Participation Agreement, the Marshall Entities, by and through Marshall Investments, agreed to act as a "Co-Lessor" on the Le Natures' equipment

financing and sell participation interests to MB and other participants. *See* Exhibit A at "Recitals."

55. As a "Co-Lessor," the Marshall Entities explicitly agreed to provide MB (as a "Participating Lessor") with "all information received by Co-Lessor from or on behalf of [Le Natures] necessary to enable [MB] to make [its independent credit analysis] and decisions…" *Id.* at ¶ 3.1(d). The Marshall Entities further represented that there was "no default, event of default, breach, violation or event of acceleration of a material nature existing under the [financing agreements with Le Natures]." *Id.* at ¶ 3.2(i).

56. The Marshall Entities, by and through Marshall Investments, further agreed that "in the event that Co-Lessor acquires actual knowledge of any default under the Financing Agreement, Co-Lessor shall, as soon as possible, give [MB] notice of such default." *Id.* at ¶ 4.5(b).

57. Still further, the Marshall Entities also agreed to indemnify MB for any losses, claims, damages, liabilities, or other expenses incurred by MB as a result of any breach of the Bank/MIC Participation Agreement by the Marshall Entities. *Id.* at ¶ 6.

58. On or about April 15, 2005, CIT also participated out, *i.e.* sold, a significant amount of its interest in the Master Lease Agreement. Indeed, CIT reduced its exposure significantly by participating out $30.5 million to Marshall Investments and approximately $70 million to two other participants. As a result, CIT reduced its $146 million commitment to approximately $46 million, $25 million of which CIT had previously lent to Le Natures back in November 2004.

59. In or around November, 2005, CIT contacted MB directly and inquired as to whether MB would be interested in acquiring an additional $10 million participation interest in

the Lease Financing directly from CIT. Relying on the continued absence of any material information that would call into question the value of the equipment or the veracity of the prior financial disclosures regarding Le Natures made by CIT and the Marshall Entities, MB agreed to purchase a participation interest directly from CIT in the amount of $4,914,013.58, which represented approximately 30% of CIT's outstanding lease balance for Line 3 of the equipment as of December 23, 2005. A copy of the Participation Agreement dated December 23, 2005 between MB and CIT (the "Bank/CIT Participation Agreement") is attached hereto as Exhibit B. As a result, CIT further reduced its exposure to approximately $41 million.

60.     Pursuant to the express terms of the Bank/CIT Participation Agreement, CIT agreed to be MB's fiscal agent for the purposes of the administration of the Lease Financing. *See* Ex. B. at ¶ 5.1.   CIT, like the Marshall Entities, also agreed to give MB notice of the occurrence of any "Event of Default" or event that, with passage of time or notice would constitute an "Event of Default" of which CIT had actual knowledge. *Id.* at ¶ 5.5.

61.     Further, CIT agreed to exercise the same duty of care to MB that CIT normally exercises in managing its own affairs with respect to leases or financing transactions in which no participations are sold. *Id.* at ¶ 6.

62.     In the Bank/CIT Agreement, CIT also represented (albeit falsely) that as of December 23, 2005, it had no actual knowledge that any default had occurred by Le Natures or that any event, which with the passage of time would constitute an "Event of Default" had occurred. *Id.* at ¶ 7.3.

***CIT and the Marshall Entities Receive but Conceal***
***Material Information About the Actual Value of the Equipment.***

63.     Unbeknownst to MB, the Marshall Entities and CIT had received, but failed to disclose, material information ***prior to*** MB acquiring a participation interest in the Lease Financing.

64.     In or around May 2007, MB learned for the first time that CIT had failed to disclose material facts relating to the actual cost and value of the equipment.  Indeed, prior to April 15, 2005, both CIT and the Marshall Entities were contacted by an informant (the "Whistleblower") who claimed that CIT and the Marshall Entities were being defrauded because the true cost and value of the equipment was substantially lower than the $184 million contract price set forth in the underlying Fabricated PMA between Le Natures and Krones (the "Tip"). The Whistleblower indicated to CIT and Marshall that he had also brought Le Natures alleged fraud to Krones' attention, but that Krones simply ignored his warnings.

65.     In addition to calling, the Whistleblower provided CIT and the Marshall Entities with a two-page spreadsheet that identified the Krones equipment for one of the bottling lines (the "Tip Spreadsheet"). For each piece of equipment, the Tip Spreadsheet identified the configured list price, discounts and selling price to Le Natures.  This information contained in the Tip Spreadsheet indicated that the amount CIT was being asked to pay for the Leased Equipment was significantly higher than the actual cost, as reflected on the Tip Spreadsheet. The Whistleblower further substantiated his claims by providing CIT and the Marshall Entities with other pertinent facts that explained the basis for his belief that they were being defrauded.

66.     Critically, the Whistleblower's allegations of fraud were not the first time that CIT had been told that something was amiss with Le Natures.  In late October 2004, long before CIT received the Tip, CIT learned that Varilease, one of its past financing partners and potential

financing partners on the Lease Financing, was pulling out of the deal solely because Le Natures was not giving Varilease full access to Krones' purchase orders for the Leased Equipment and was otherwise not giving Varilease an opportunity to speak with Krones.  Without full access to the vendor of the Leased Equipment being financed, Varilease smelled trouble and pulled out of the deal and warned CIT that they should do the same.  CIT, nevertheless, chose to proceed.

67.     After receiving the Tip, CIT purportedly conducted an investigation into the Whistleblower's allegations in March 2005.  In contrast, the Marshall Entities, who had no "skin in the game," chose to do little but wait for CIT to complete its investigation.

68.     Rather than speaking with objective sources of information, CIT questioned only Le Natures and Krones – the two entities with the most incentive to refute the Whistleblower's allegations.  In response, Le Natures and Krones attempted to refute the Whistleblower's allegations by providing CIT and the Marshall Entities with written equipment pricing information and oral representations alleging that the Whistleblower's allegations were without merit.  However, CIT did nothing to audit or otherwise verify the actual manufacturing costs of the Leased Equipment.  Incredibly, despite the overwhelming evidence of fraud on the part of Le Natures and Krones, CIT insists that it failed to discover any overvaluation of the Leased Equipment or any other wrongdoing.

69.     In defense of its investigation, and as articulated in the CIT Arizona Complaint, CIT insists that the results of its investigation were justified given the assurances from Krones and Le Natures that the Leased Equipment prices had not been wrongly inflated.  To the contrary, CIT's own allegations demonstrate that Krones' and Le Natures' efforts to explain the discrepancies by making vague and amorphous  references to "soft costs," such as engineering,

design and installation, and the alleged costs of shipping the equipment from Krones AG in Germany, were evasive and highly suspect.

70.    Moreover, by its own recent admission in the CIT Arizona Complaint against Krones (discussed further *infra*), CIT was "concerned [at the time] that Le Natures was attempting to over-finance the [equipment] by providing false information to CIT and the [p]articipants regarding the true purchase price that had been negotiated with Krones."  CIT was also concerned that Krones was a participant in the fraud.  In the end, however, CIT chose to look the other way and decided to proceed with transaction.  As set forth in ¶ 72 of CIT's Arizona Complaint against Krones:

> As a result of its investigation, as well as the statements and documentation provided by Le-Nature's and Krones, CIT concluded that the caller's allegations were unfounded.  Thereafter, CIT <u>and the Participants</u> proceeded with the Le-Nature's transaction. (emphasis added)

71.    While CIT is correct that MB and the other Participants proceeded with the transaction, MB and the other Participants did so ***without knowing*** that any allegations of fraud had been raised.  Although the Whistleblower's allegations and CIT's alleged investigation were material events that arose during the due diligence phase of the Le Natures Opportunity, CIT and the Marshall Entities conspired and agreed to keep this information confidential and not disclose this material information to any of the Participants or potential Participants in the Lease Financing.

72.    In June 2005, after MB had funded its participation commitment (but long before the Le Natures bankruptcy), and allegedly after CIT and the Marshall Entities had concluded that the Whistleblower's allegations were "unfounded," CIT received an appraisal of the Leased Equipment.  The appraisal indicated that the Leased Equipment had a fair market value of $80.45 million – less than half of what was being paid.  CIT also learned, contrary to previous

representations, that after five years the Leased Equipment would have an orderly liquidation value of only $15 million.   Finally, the appraisal estimated the useful life of the Leased Equipment to be 9.5 years over 15 years shorter than what was represented in the *Information Memorandum.*

73.     The appraisal confirmed what the Whistleblower had previously shared with CIT and the Marshall Entities.   Again CIT and the Marshall Entities did nothing and hid these material facts from MB and the other participants.

74.     Accordingly, neither CIT nor the Marshall Entities disclosed to MB either the existence of the allegations being made by the Whistleblower CIT's alleged investigation into those allegations or the appraisal of the Leased Equipment.   The equipment was the only collateral securing the financing to Le Natures.   Therefore, the fact that allegations (which were true) were being made that the cost and value of the equipment were substantially overstated was a material fact that both CIT and the Marshall Entities intentionally omitted from the oral and written representations they made to MB about the Le Natures Opportunity.   MB was entitled to know this material fact so that it could perform its own due diligence and make an informed decision as to whether the Whistleblower's claim had merit or not and, in any event, whether it still wanted to participate in the Le Natures Opportunity knowing that these allegations had been made.

75.     The Whistleblower's allegations turned out to be well founded, as the actual cost of the Leased Equipment was approximately $90-$100 million and the Leased Equipment was recently liquidated as part of Le Natures' bankruptcy for approximately $30 million.   Moreover, regardless of the actual cost of the equipment, the mere allegation of impropriety is a material

fact that would have necessarily impacted MB's credit decision and called into the question the veracity of all information being provided about Le Natures.

76.     The Marshall Entities were aware of, but failed to disclose, other material facts. For example, because of his close relationship with Podlucky, Sharp knew that Podlucky was a grossly extravagant spender.  Sharp, however, failed to disclose this material information, which would have brought the character of Mr. Podlucky into question.

77.     On information and belief, CIT and the Marshall Entities also knew, but failed to disclose, that Le Natures' reported sales volume to the accounts west of the Mississippi River was not accurate, but grossly overstated.

78.     While failing to disclose the foregoing material facts to MB, CIT and the Marshall Entities also made certain that MB did not communicate directly with Le Natures or with Krones.  CIT and the Marshall Entities did not provide a contact person for MB to work with at Le Natures.  Instead, CIT and the Marshall Entities indicated that any and all of MB's questions should be directed either to the Marshall Entities or CIT.

79.     Not only did CIT and the Marshall Entities limit the stream of information available to MB, they stood in a superior position to access material information based on their ability to directly communicate with Le Natures and Krones.

80.     Each of the aforementioned misrepresentations made by the agents and/or employees of CIT and the Marshall Entities were made within the line and scope of their employment and with the intent to benefit their employer or principal.

81.     With respect to the aforementioned misrepresentations and omissions, MB necessarily placed heavy reliance on CIT, Sharp and the Marshall Entities, who were the only source of dissemination of information regarding the Le Natures Opportunity and Lease

Financing.  Indeed, in light of the role of CIT and the Marshall Entities in marketing the Le Natures Opportunity, CIT and the Marshall Entities were in a superior position, as compared to MB, to know the actual value of the Leased Equipment, the true financial status of Le Natures and the risk associated with the Le Natures Opportunity.  Accordingly, MB placed heavy reliance on the information being conveyed by CIT and the Marshall Entities, and would not have entered into the Lease Financing but for the representations made by CIT and the Marshall Entities.  MB relied to its detriment upon the representations made by CIT and the Marshall Entities and the apparent non-existence of any negative or questionable information about the cost and value of the equipment.

### *The Fraudulent "Excess Payment" Kickback Scheme*

82.  After CIT and the Marshall Entities closed the financial transaction on April 15, 2005, they became aware of further improper conduct by Le Natures and Krones.  Yet, rather than blowing the whistle and informing the Participants, they again substantially assisted the fraudulent scheme being orchestrated and perpetrated by Le Natures, Sommer, Kronseder and Krones, among others.

83.  In general terms, the fraudulent scheme was orchestrated through various purported transfers of funds from Le Natures to Krones through Le Natures' equipment broker – the Pollinger Company ("Pollinger").  According to Le Natures' financial statements, the company had placed large deposits with Pollinger to secure from vendors delivery of critical bottling equipment for Le Natures' bottling facilities, including a line in Latrobe.

84.  Le Natures' records indicate that Pollinger, which was a two-man company operated out of one of the owner's home in North Carolina, purportedly received wired funds

from Le Natures totaling $461 million in deposits between July 2002 through June 2006.  In reality, the true amount of the deposits was under $3 million.

85.     These transfers were never made by Le Natures (through Pollinger or otherwise) nor received by Krones.  However, fictitious financial statements were prepared by Le Naturs so as to evidence these phantom transfers.  When Krones received monies from the Participants (through CIT) it would "kickback" the excess funds (over and above the actual cost of the Leased Equipment) to Le Natures.

86.     From April 15, 2005 through August 5, 2005, CIT periodically received draw request certificates requesting that CIT make required installment payments to Krones for the Leased Equipment with funds provided by MB and other investors. The draw requests were signed by Gregory Podlucky and served to verify that the Leased Equipment had been shipped to and installed at the Phoenix Facility by Krones, and accepted by Le Natures. Collectively, for this time period, the draw requests totaled approximately $100 million (the "Purchase Price Fundings").

87.     Next, Le Natures represented to CIT, the Marshall Entities and other Participants that, over time, a majority of the *fictional* deposits had been transferred from Pollinger to Krones. Purportedly, the deposits were used by Krones as partial payment for equipment to be installed at the new Phoenix Facility.  Krones corroborated Le Natures' fraudulent representations by falsely claiming that it held at least $80 million of these deposits, when, in fact, it had received no funds from Pollinger and held less than $1 million from Le Natures in connection with the Phoenix Facility.

88.     On or about April 10, 2005, Podlucky proposed that CIT pay directly to Le Natures the first two installment payments for each bottling line and to have Krones draw down

on the alleged deposits to satisfy the amounts owed under the PMA.  CIT chose not to agree to make payments directly to Le Natures, but preferred that all monies for the Leased Equipment be paid directly to Krones.

89.     In response, on or about April 29, 2005, CIT received a document that had been executed by Podlucky and Sommer. The agreement stated that certain Purchase Price Fundings would include amounts owed to Le Natures as a refund for the purported deposits (the "Excess Funds Agreement").  CIT was not a party to the Excess Funds Agreement, and neither CIT nor the Marshall Entities informed MB of this arrangement.  Shortly thereafter, Krones U.S. began receiving payments from investors for the bottling equipment manufactured by Krones AG. Krones U.S., citing to the non-existent $80 million in deposits that it claimed to have received from Le Natures, began "refunding" money to Le Natures pursuant to the terms of the Fabricated PMA and Excess Funds Agreement.

90.     The "excess payment" arrangements between Krones and Le Natures are highly unusual and are not commercially reasonable practices.   Instead, equipment financing is determined by, and limited to, *the actual cost of the equipment being manufactured*.  It is not reasonable for an equipment financier/lessor – through the equipment financing transaction – to make an unsecured loan to the lessee by simply inflating the price of manufactured equipment.

91.     Nonetheless, CIT consented in writing to Krones making these "excess payments" to Le Natures.  Moreover, upon information and belief, most of the excess payments made to Le Natures were from funds of other participants and sub-participants of the Marshall Entities, including $10 million from MB, and not CIT's own money.

92.     One such consent, a May 6, 2005 email from Buzz Carr ("Carr") of CIT to William Nazarkewich of Krones stated:

This wire is being allocated as follows:

$4,286,738.00 – allocated to Installment 3, Line 2

$394,457.00 –allocated to Installment 3, Line 4a

$13,547,103.30 – allocated to Installment 2, Line 2.  This amount falls within the definition of Excess Payments contained in the Agreement between Le-Nature's, Inc. and Krones, Inc. dated April 26, 2005.

93.     The April 26, 2005 agreement referred to in Carr's email provided that Krones was to send "excess payments" to Le Natures.  Thus, Carr was willing to hand over to Podlucky over 75 percent of an over $18 million financing.  Although a later communication reduced the "excess payment" to approximately $8.5 million, that sum still amounted to almost half of the wired monies.  In addition, although Carr engaged in the charade of "allocate[ing]" the $13.5 million (changed to $8.5 million) of that financing to "Installment 2, Line 2," those monies were really bypassing "Line 2" and going straight back to Podlucky.

94.     Three days later, Carr sent over $10.8 million to Krones, *and allocated the entire amount to "Excess Payments."*  Amazingly, Carr made the following admission: "[i]n order to clarify our recordkeeping, CIT will be allocating this funding to Installment 1 on Line 2."  In short, CIT was also "cooking its books."

95.     Carr's conduct was completely at odds with an earlier email, dated April 12, 2005, in which he forwarded payment reconciliations for equipment manufactured by Krones and outlined to Podlucky the procedures that CIT Group proposed for payments on that equipment:

Our thought is that we get Krones to acknowledge this [payment reconciliation] detail as correct.  Then, we advise them we are sending $XX as payment on Installment 1 on Line X.  We will tell them we are only sending that money on the understanding it will relieve the requirement for deposits to the extent of the payment.  Does that make sense?

96.     No mention is made of excess payments or of any sums being funneled out of equipment financing and back to Podlucky.

97.     Ultimately, a June 7, 2005, email from Carr to Podlucky disclosed that over $45 million in financing was supposed to fund the construction of "Line 2," and that as of June 7, almost $38 million had been paid.  Of course, what Carr's June 7 email does not say is that almost $25 million of that $38 million *had constructed nothing and had just been given to Le Natures*.

98.     CIT, the Marshall Entities and Krones, along with Podlucky, other Le Natures' employees and Pollinger, were key participants in this "refund" component of the fraudulent scheme.  As explicitly acknowledged by CIT in the CIT Arizona Complaint, the total amount of the Excess Funds paid by CIT to Krones, and then paid by Krones to Le-Nature's, purportedly as a return of deposits, approximated $60 million.

99.     Neither CIT nor the Marshall Entities informed MB or other participants or sub-participants that any portion of its investment was being refunded to Le Natures.  Such information was material and both CIT and the Marshall Entities had a legal obligation to disclose it.

100.    Krones commenced its kickbacks to Le Natures – including payments for equipment not even covered by the PMA – almost immediately after the PMA was effectuated. The mechanics of Krones' payments remained consistent throughout the existence of its fraudulent enterprise with Le Natures.  Krones – working from its U.S. headquarters in Wisconsin and routing funds through Minneapolis, Minnesota – sent kickbacks to Le Natures within days of the source wires received from the Participants and other investors.  Typically, Krones' kickbacks were accompanied by an email sent directly to Gregory Podlucky (Le

Natures' founder and CEO, hereinafter "Podlucky") informing him that the funds were being wired to Le Natures.  Krones recorded the kickbacks in various ways on its internal wire form reference lines, including as "Further Credit Le-Nature's, Inc.", "Per Agreement", or simply "REFUND".

101.    For example, on or about August 27, 2004, Merrill Lynch wired $11,279,470.79 to Krones for certain bottling equipment.  Three (3) days later, on or about August 30, 2004, Krones forwarded nearly 20% of this payment – $2,144,687.49 – directly to Le Natures.  The remaining $9,134,783.30 retained by Krones is identified on documents accompanying the wire as "10% of Contract Price."  This is a startling admission that the *actual* price of the equipment was only $91.3 million.

102.    Similarly, on or about November 15, 2004, Krones received a wire transfer of $13,800,984.30 from CIT.  Le Natures, through Gregory Podlucky, sent a subsequent fax to Sommer at Krones' Wisconsin headquarters stating that the Le Natures would be receiving the funds, less 10% of the contract price (i.e., $9,134,783.30).  Shortly thereafter, Krones wired approximately $4,666,201.00, routed through Minneapolis, Minnesota, to Le Natures.  Krones' controller, William Nazarkewich, followed up with a confirming e-mail to Gregory Podlucky.

103.    That same week, on November 18, 2004, Krones received another wire from Merrill Lynch for $3,583,866.64.  Podlucky again sent a fax to Sommer at Krones' Wisconsin headquarters stating that the "Wire back to Le*Nature's" amount was $2,089,277.84.  In what had already become a pattern of fraudulent activity, Krones kicked back that amount to Le Natures in the form of a wire transfer routed through Minneapolis, Minnesota.

104.    In total, between August 2004 and June 2006, Krones received wire payments from various investors, including the Participants, in an amount totaling $227.5 million.  These

payments were made in connection with Leased Equipment, as well as certain other equipment related to Le Natures' Latrobe facility and its planned Jacksonville, Florida facility.  Krones, in turn, made at least fourteen (14) kickback payments to Le Natures totaling more than $118 million – which was more than one-half of the total funds it had received from investors.

### *The Kickback Scheme was a Critical Component of the Le Natures Fraud*

105.    Le Natures' fraudulent operation was perpetuated, in large part, by the $118 million dollars it illegally obtained through its kickback scheme with Krones as the funds enabled Le Natures to create the illusion of a legitimate profit making business.

106.    Le Natures used the kickback funds to keep it afloat.   Because Le Natures' expenses were greater than its revenues, the company utilized the kickback cash to make payments that were coming due under existing financing and lease agreements, and to meet payroll and other operational expenses.   Without the kickbacks, Le Natures' financial troubles would have been revealed and Le Natures would never have been able to obtain even financing from investors/lenders such as MB.

107.    Additionally, the kickback scheme was a central element in Le Natures' manipulation of its financial statements.   Le Natures used the fraudulent "refunds" to offset falsely reported revenues.   The deposits, however, could not accumulate unabated to match the full revenue overstatement.   Le Natures, therefore, used the purported refunds from Krones to reduce the reported level of deposits, thereby enabling Le Natures to report *more* false revenues and to further fabricate deposits as offsets to balance the Le Natures' false account statements. In this manner, the kickbacks from Krones were a critical component in Le Natures' overstatement of revenues, and resulting overstatements of income and shareholder equity.

These inflated amounts, in turn, enabled Le Natures to continue borrowing money thereby further perpetuating its fraudulent existence.

### *Krones Ignores Whistleblower's Warnings*
### <u>*Concerning Le Natures' Fraudulent Conduct*</u>

108.    In June 2004, prior to execution of the PMA between Krones and Le Natures, the Whistleblower informed Krones, including Kronseder, Sommer and certain other Krones' officers, that Le Natures had intentionally and improperly overstated the costs of the bottling equipment manufactured by Krones by more than $90 million.   The Whistleblower had apparently been employed or otherwise affiliated with Krones in such a manner that he had access to information concerning Le Natures' inflated pricing and fraudulent equipment financing.

109.    Upon information and belief, Sommer and Kronseder were aware of the Whistleblower's allegations and supporting documentation. Nevertheless, despite the early and explicit warnings, and Krones' own internal documentation establishing the true cost of the bottling equipment, Sommer and Kronseder worked with Le Natures (though Gregory Podlucky) in furtherance of the fraud by fabricating equipment schedules that supported the higher, fraudulent prices and offering excuses for why the financing seemed to be more than the true equipment costs.

110.    Upon information and belief, senior officers and executives of Krones – including both Krones AG and Krones U.S. – were told on numerous occasions that Le Natures was seeking to perpetrate a fraud by double leasing equipment for the Phoenix Facility and were provided with written evidence of the overpricing.   Moreover, subsequent to the June 2004 explicit warning, at an industry trade dinner in November 2004, Kronseder was told directly that

Le Natures was double-leasing equipment; *i.e.*, that Krones was charging approximately $180 million for equipment that cost only $90 million.

111.    During the fall of 2005, Krones and LeNatures made plans to expand their fraudulent scheme.  In order to keep up the illusion of a growing company, LeNatures needed to obtain more cash.  Aside from credit facilities financed by certain lenders, LeNatures' primary source of funding was "excess payments" resulting from equipment lease financing.  Therefore, Krones and LeNatures acted promptly upon the close of financing for the Phoenix Facility to execute new PMAs for the provision of additional equipment in Phoenix and for a proposed new facility in Jacksonville, Florida or Atlanta, Georgia.  In the fall of 2005, LeNatures and Krones joined together in plotting or executing at least three new projects in locations around the country.

112.    To further the fraudulent scheme, in the spring of 2006, Podlucky and Sommer (acting on behalf of Krones), executed new excess payment agreements to cover these new projects, despite the fact that the "deposits" that purportedly justified the excess payments were never made.  As before, the plan was for Krones simply to hand over cash from the lessors to LeNatures.  In this manner, Krones funneled millions of more dollars to LeNatures, enabling LeNature's further to manipulate its reported financial performance.

### COUNT I - CIVIL RICO
**(Against Krones U.S., Krones AG, Sommer and Kronseder)**

113.    MB adopts and incorporates its allegations in paragraphs 1 through 112 of this Third Amended Complaint as though fully set forth herein.

### The Krones and Le Natures Enterprise

114.    MB is a "person" within the meaning of 18 U.S.C. § 1961(3).

115.     Defendants Krones U.S., Krones AG, Sommer and Kronsder are "persons" within the meaning of 18 U.S.C. § 1961(3).

116.     Defendants Krones, U.S., Krones AG and their employees, including Kronseder and Sommer (the "Krones Defendants"), together with Le Natures and Gregory Podlucky (collectively the "RICO Association"), are a group of corporations and individuals associated in an "enterprise" for the purpose of defrauding various victims and for other illicit purposes (the "Le Natures Enterprise") within the meaning of 18 U.S.C. § 1961(4).

117.     The Krones Defendants participated directly, or indirectly, in the conduct of the affairs of the Le Natures Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

118.     The Krones Defendants conducted and participated in the affairs of the Le Natures Enterprise in order to engage in a pattern of racketeering with three illegal aims:

      (a)     to fraudulently obtain money by committing various frauds;

      (b)     to defraud MB, the other Participants and others so as to unlawfully enrich themselves; and

      (c)     to corruptly conceal their racketeering activity by filing false documents and providing such false documents to MB and others.

119.     The pattern of racketeering activity engaged in by the Krones Association, affected interstate or foreign commerce and consisted of numerous violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.

120.     The pattern of racketeering activity engaged in by the RICO Association began in or about 2004 and continued through 2006. All of the predicate acts of racketeering activity described in this Third Amended Complaint are related to the same or similar purposes, results

and participants, and have the same goals (namely the enrichment of the Krones Defendants at the expense of MB and the other Participants and have the same methods of commission and are otherwise inter-related by distinguishing characteristics, and are not isolated incidents.

### The RICO Pattern

121.     Between 2004 and 2006, the Krones Defendants, Le Natures and Podlucky and others engaged in a scheme and artifice to defraud MB and the other Participants by making false and fraudulent representations in connection with the financing and sale of the Leased Equipment.  It was the plan and purpose of the scheme to, among other things: personally enrich the RICO Association and provide substantial compensation to Le Natures, Krones, Sommer, Kronseder, and Podlucky by, among other things, the sale of equipment and financing of equipment for Le Natures.  The scheme involved financial institutions, such as MB and the other Participants, purchasing hundreds of millions of dollars worth of bottling equipment from Krones, which equipment was in turn leased to Le Natures in exchange for monthly rent payments.

122.     Unbeknownst to their victims, Le Natures, Krones U.S., Krones AG, Sommer and Kronseder provided false and misleading information regarding the purchase price of the bottling equipment. With regard to the Phoenix Facility, MB and other financial institutions were told orally and in writing that the purchase price for all of the bottling equipment was in excess of $180 million. In fact, the true purchase price negotiated between Le Natures and Krones, which price was made known to CIT and Marshall but concealed from MB and the other Participants, was approximately $90 million. Similarly, with regard to Le Natures' planned southeast facility, the members of the RICO Association told other financial institutions that the purchase price for the bottling equipment was substantially higher than the true purchase price. With regard to the

Phoenix Facility and planned southeast facility the Participants and other financial institutions were harmed in amounts in excess of approximately $120 million.

123.    The conduct and acts of the RICO Association, in furtherance of their fraudulent scheme included, but were not necessarily limited to the following: (a) misrepresenting the nature and extent of Le Natures' investment in the bottling equipment manufactured by Krones, so as to improperly inflate the equipment's cost and generate financing that would ultimately be diverted to Le Natures; (2) deceive the investors and/or lenders, including MB, by representing that Le Natures had made significant deposits with Krones in connection with the bottling equipment to be used for the Phoenix Facility, as well as certain other facilities; (3) diverting and transferring funds to Le Natures from investors and/or lenders, including MB, that were intended to be used to pay for the bottling equipment at issue; and (4) concealing from the investors and/or lenders the misuse of the funds that had been raised to purchase the bottling equipment, as well as to conceal the true financial condition of Le Natures.

124.    From in or about 2004 through in or about 2006, the members of the RICO Association knowingly devised a scheme or artifice to defraud MB and the other Participants, and obtain money and property by means of false and fraudulent pretenses, representations or promises from the Participants and others.  For the purpose of executing such scheme and artifice or attempting to do so, the Krones Defendants, Le Natures and Podlucky knowingly caused to deliver by mail or commercial interstate carrier, according to the direction thereon, and caused to be transmitted by means of interstate wire communication, writings, signs and signals more specifically set forth below, each mailing and interstate wire communication constituting a separate act of racketeering ("RICO Act"):

| RICO Act 1 | April – September 2005 | Krones knowingly accepts wire transfers from CIT totaling approximately $100 million, claiming that |

|  |  | the payments represented the balance of the cost of purchasing and installing the Leased Equipment. |
|---|---|---|
| RICO Act 2 | April 15 - 20, 2005 | CIT receives by wire transfer approximately $24 million from Participants and in turn wires approximately $7 million to Krones for the purported purchase of the Leased Equipment. |
| RICO Act 3 | April 29, 2005 | CIT receives by wire transfer approximately $6 million from Participants and in turn wires approximately $11 million to Krones for the purchase of the Leased Equipment. |
| RICO Act 4 | May 6, 2005 | CIT receives by wire transfer approximately $12 million from Participants and in turn wires approximately $18 million to Krones for the purported purchase of the Leased Equipment. |
| RICO Act 5 | May 13, 2005 | CIT receives by wire transfer approximately $4 million from Participants and in turn wires approximately $7 million to Krones for the purported purchase of the Leased Equipment. |
| RICO Act 6 | May 26, 2005 | CIT receives by wire transfer approximately $4 million from Participants and in turn wires approximately $7 million to Krones for the purported purchase of the Leased Equipment. |
| RICO Act 7 | June 22, 2005 | CIT receives by wire transfer approximately $19 million from Participants and in turn wires approximately $19 million to Krones for the purported purchase of the Leased Equipment. |
| RICO Act 8 | July 27, 2005 | CIT receives by wire transfer approximately $16 million from Participants and in turn wired approximately $16 million to Krones for the purported purchase of the Leased Equipment. |
| RICO Act 9 | August 5, 2005 | CIT receives by wire transfer approximately $15 million from Participants and in turn wires approximately $15 million to Krones for the purported purchase of the Leased Equipment. |
| RICO Act 10 | August 2005 – October 2006 | Le Natures pays monthly lease payments to CIT via checks mailed using the United States Postal Service. |

| RICO Act 11 | August 2005 – October 2006 | Via electronic mail, Le Natures sends documentation required under the Closing Documents to CIT, including Le Natures' purported quarterly statements. |
|---|---|---|
| RICO Act 12 | March 2005 | Podlucky informs CIT, via electronic mail, that he is "perplexed" about CIT's concerns over apparent pricing discrepancies, and that CIT is misinterpreting the pricing. |
| RICO Act 13 | March 21, 2005 | Via electronic mail to CIT, Podlucky states that a full reconciliation of all costs for the project was being prepared and would include all change orders. Podlucky also indicates that he did not receive pricing discounts from Krones in connection with the bottling equipment. |
| RICO Act 14 | March 22, 2005 | Via facsimile to Tom Magrath (CIT employee), the RICO Association sends a specification sheet ostensibly identifying each piece of Leased Equipment for line 1, showing a total cost of approximately $46.1 million. |
| RICO Act 15 | March 24, 2005 | Kronseder spoke by telephone with Roy Keller (CIT employee) and states that the value of equipment already shipped to Krones, U.S. was $100 million, but represents that this amount reflects the inter-company price and not the price Krones, U.S. would charge CIT. |
| RICO Act 16 | Various times prior to March 24, 2005 | Krones wires to Le Natures portions of an $11.6 down payment totaling approximately $5 million. The funds were originally wired from CIT to Krones, and Krones represented that the funds were not being remitted to Le Natures. |
| RICO Act 17 | March 24, 2005 | Sommer speaks with CIT by telephone and states that: (i) the total price of the equipment was approximately $184 million; (ii) the price of the equipment included a "mark-up" over the amount Krones, U.S. was invoiced by Krones AG; (iii) he had been in Podlucky's office during the March 22 telephone call; (iv) he had helped compile the specification sheets provided to CIT; (v) Podlucky's statements that this was the first time specification |

sheets were prepared was accurate; (vi) Krones had received an $11.5 million down payment from Le Natures; and (viii) Krones had not paid any funds received for the Leased Equipment back to Le Natures.

| | | |
|---|---|---|
| RICO Act 18 | March 28, 2005 | Podlucky, via facsimile, sends specification sheets for all four bottling lines to CIT, ostensibly identifying each piece of Leased Equipment and the corresponding purchase price being charged by Krones AG, which according to the sheets, were consistent with the purchase price in the Fabricated PMA. The sheets were signed by Podlucky, and Rainulf Diepold (CFO of Krones AG). |
| RICO Act 19 | March 28, 2005 | Via letter from Sommer to Roy Keller (President of CIT), Sommer claims that the information provided on the Tip Spreadsheet was actually information for a bottling project different from the Phoenix Facility. |
| RICO Act 20 | April 15 – August 5, 2005 | Via United States mails and/or wire, CIT periodically receives draw request certificates and Krones' invoices CIT for installment payments to Krones for the Leased Equipment. Collectively, the draw requests totaled approximately $100 million. |
| RICO Act 21 | April 29, 2005 | Via United States mails and/or wire, Le Natures and Krones present CIT with an Excess Funds Agreement, directing CIT to indicate which portions of future payments under the Fabricated PMA constitute Excess Funds. Consistent with this Excess Funds Agreement, each subsequent wire transfer of payments was accompanied with a letter identifying the Excess Funds. Such Excess Funds were remitted by Krones to Le Natures. The total amount of such remittances was approximately $60 million. |
| RICO Act 22 | December 29 and February 3, 2005 | Krones pays to Le Natures via wire transfer or U.S. Mail approximately $20 million of the $26 million payments, instead of using such funds for the manufacture and purchase of bottling equipment. |
| RICO Act 23 | February 3, 2005 | Krones and Le Natures transfer by wire communications approximately $11 million from an account controlled by Krones to an account maintained at S&T Bank, in Indiana, Pa., instead of |

using such funds for the purchase and manufacture of bottling equipment.

125.    These mail and wire transmissions were all undertaken with the specific intent to be part of and in furtherance of the frauds perpetrated upon MB and other Participants as described above, and are all in violation of 18 U.S.C. §§ 1341, 1343.

126.    The racketeering activity constituted a pattern of racketeering activity with the meaning of 18 U.S.C. § 1961(5).  The racketeering activity was both related and continuous.  As to relatedness, the predicate acts of racketeering activity are related to the same or similar purposes, results and participants, and have the same goals, namely the enrichment of the Krones Defendants at the expense of MB, the other Participants and others, and have the same methods of commission and are otherwise inter-related by distinguishing characteristics, and are not isolated incidents.

127.    The patter of racketeering activity was sufficiently continuous under either the closed-end or open-end continuity standards.  As for closed-ended continuity, the racketeering activity began in or about 2004 and lasted until exposed in or about 2006.  The racketeering activity was a regular way for the Krones Defendants and the Le Natures Enterprise to conduct business.  Moreover, the racketeering activity would have continued unabated had the activities not been exposed, satisfying the open-end standard.

128.    By virtue of the aforementioned ongoing scheme and artifice to defraud, the Defendants have violated the provisions of 18 U.S.C. § 1962(c).

129.    By reason of the Krones Defendants' violation of 18 U.S.C. § 1962(c), the Krones Defendants have directly and proximately caused injury and financial loss to Compass in its business and property.

WHEREFORE, MB Financial Bank, NA prays for the following relief against the Krones Defendants: (1) judgment against the Krones Defendants, jointly and severally, for the full amount of compensatory and punitive damages proven at trial, restitution, disgorgement of profits, treble damages, plus all pre-judgment and post-judgment interest allowed by law until the judgment is paid in full; (2) judgment against the Krones Defendants, jointly and severally, for the costs, attorneys' fees and other expenses incurred in this action; and (3) other relief as the Court deems proper.

## COUNT II – FRAUDULENT CONCEALMENT
### (Against CIT and The Marshall Entities)

130.    MB adopts and incorporates its allegations in paragraphs 1 through 112 of this Third Amended Complaint as though fully set forth herein.

131.    Prior to April 15, 2005, CIT and the Marshall Entities were aware that allegations of fraud were being made against Le Natures and Krones.  In particular, the allegations called into question the actual cost and value of the equipment being purchased and leased to Le Natures.

132.    CIT and the Marshall Entities conducted an investigation into the allegations of fraud, pursuant to which they had multiple conversations with representatives of Le Natures and Krones, received certain oral and written representations from Le Natures and Krones and reviewed certain documentation.

133.    The existence of these allegations of fraud, the veracity of the allegations and the investigations conducted by CIT and the Marshall Entities were material facts that would have impacted MB's decision to acquire a participation interest in the Lease Financing.  Indeed, MB's (i.e., Oak Brook Bank) loan policy focused on the borrower's reputation for honesty and

integrity.   Any allegations of fraud would have been a sufficient reason for MB not to do the deal.

134.   CIT and the Marshall Entities clearly stood in a superior position to access material information based on their ability to directly communicate with Le Natures and Krones. The superior position of CIT and the Marshall Entities, as compared with MB, is readily apparent by the fact that CIT and the Marshall Entities had access to Le Natures and Krones to conduct the investigation into the Whistleblower's tip and, moreover, had the ability to conceal the tip, the investigation and the results of the investigation from MB made by the Participants.

135.   CIT and the Marshall Entities knowingly or recklessly failed to disclose to MB the existence of these allegations of fraud, the investigation done by CIT and/or the Marshall Entities into these allegations of fraud, the result of any investigations done and/or any correspondence or communications with Le Nature's or Krones regarding these allegations of fraud.

136.   CIT and the Marshall Entities also failed to disclose the existence and nature of the Excess Payment Agreement between Le Natures and Krones, and further failed to disclose that CIT and the Marshall Entities consented to payments being kickbacked from Krones to Le Natures as purported refunds.

137.   CIT and the Marshall Entities had a duty to disclose this material information to MB because, among other reasons:  (i) both CIT and the Marshall Entities were in the business of supplying material information to MB (and other potential participants) in connection with the Le Natures' Opportunity and Lease Financing; (ii) CIT and the Marshall Entities were clearly in the dominant position and had superior knowledge to MB regarding the allegations of fraud being made against Le Natures and Krones and the Excess Payment Agreement; (iii) MB could

not have obtained this material information in exercise of reasonable care and due diligence; (iv) the existence of the allegations of fraud against Le Natures and the Excess Payment Agreement was not contained in the Information Memorandum nor were these facts otherwise in the public domain; (v) the particular circumstances alleged above; (vi) the relation of the parties; and (vii) CIT and the Marshall Entities knew or should have known that MB was acquiring a participation interest in the Lease Financing based on a mistake as to the facts and the absence of allegations of fraud.   Moreover, CIT and the Marshall Entities made partial representations/disclosures regarding the cost and value of the equipment, and were therefore under a duty to make a full and fair disclosure of all material facts relating to the cost and value of the equipment.

138.   MB reasonably and justifiably relied upon the absence of such material information in making its decision to purchase both a participation interest from Marshall Investments and a participation interest from CIT.  CIT and the Marshall Entities knew, or were reckless in not knowing, that their decision to conceal this material information would induce and result in, and did result in, MB's purchase of two participation interests in the Lease Financing.  CIT and the Marshall Entities further knew, or were reckless in not knowing, that the disclosure of this material information would lead MB to forego any purchase of a participation interest in the Lease Financing.

139.   As a result of the Marshall Entities' and CIT's fraudulent concealment of this material information, MB has suffered compensatory damages in excess of $8 million.  If MB had been made aware of these allegations of fraud or the Excess Payment Agreement, it would not have purchased any participation interests in Lease Financing.

140.     MB is entitled to punitive damages as a result of the Marshall Entities' and CIT's fraudulent concealment of material information relating to the Le Nature's Opportunity and Lease Financing.

WHEREFORE, Plaintiff, MB FINANCIAL BANK, N.A. demands judgment in its favor and against Defendants, Marshall Investments Corporation, Marshall Financial, Inc., The Marshall Group and Marshall BankFirst and against Defendant CIT Group/Equipment Financing, Inc.: (a) awarding MB its compensatory damages in an amount to be proven trial; (b) awarding MB punitive damages; and (c) awarding MB such other and further relief as it deems appropriate.

### COUNT III – NEGLIGENT MISREPRESENTATION
**(Against CIT and the Marshall Entities)**

141.     MB adopts and incorporates its allegations in paragraphs 1 through 112 of this Third Amended Complaint as though fully set forth herein.

142.     Prior to April 15, 2005, the Marshall Entities and CIT were aware that allegations of fraud were being made against Le Natures and Krones.  In particular, the allegations called into question the actual cost and value of the equipment being purchased and leased to Le Natures.  Both the existence of these allegations of fraud and the veracity of the allegations were material facts that would have impacted MB's decision to acquire a participation interest in the Lease Financing.

143.     The Marshall Entities and CIT failed to disclose to MB the existence of these allegations of fraud, any investigation done by the Marshall Entities or CIT into these allegations of fraud, the result of any investigations done and/or any correspondence or communications with Le Natures or Krones regarding these allegations of fraud.  The Marshall Entities and CIT kept this material information confidential for their own benefit and use.

144.    In addition, CIT and the Marshall Entities also failed to disclose the existence and nature of the Excess Payment Agreement between Le Natures and Krones, and further failed to disclose that CIT and the Marshall Entities consented to payments being kickbacked from Krones to Le Natures as purported refunds.

145.    The Marshall Entities and CIT were in the business of supplying material information to MB (and other potential participants) in connection with the Le Nature's Opportunity and the Lease Financing.  The Marshall Entities and CIT had a duty to disclose all material information to MB, as the Marshall Entities and CIT were clearly in the dominant position and had superior knowledge to MB regarding the allegations of fraud being made against Le Natures and Krones as well as the Excess Payment Agreement.  Indeed, MB had no access to Le Natures or to Krones, and was told by the Marshall Entities and CIT that any and all questions regarding the Le Nature's Opportunity or the Lease Financing should be directed solely to the Marshall Entities or to CIT.  The existence of the allegations of fraud against Le Natures and the Excess Payment Agreement was not contained in the Information Memorandum nor were these facts otherwise in the public domain.  Moreover, the Marshall Entities and CIT made partial representations/disclosures regarding the cost and value of the equipment, and were therefore under a duty to make a full and fair disclosure of all material facts relating to the equipment.

146.    An ordinary person in the position of the Marshall Entities and in the position of CIT exercising reasonable care and competence would have communicated this material information to MB prior to April 15, 2005 so that MB could receive full and fair disclosure of all material facts relating to the Le Nature's Opportunity.  CIT and the Marshall Entities, moreover, had additional opportunities to communicate this material information to MB subsequent to April

15, 2005 but prior to MB's purchasing a second participation interest directly from CIT on December 23, 2005.

147.    MB reasonably relied upon the absence of such material information in making its decision to purchase both a participation interest from the Marshall Entities and a participation interest from CIT.  CIT's and the Marshall Entities' failure to disclose or otherwise communicate this material information to MB was negligent.

148.    As a result of the Marshall Entities' and CIT's negligent suppression of this material information, MB has suffered compensatory damages in excess of $8 million.  If MB had been made aware of these allegations of fraud and the existence of the Excess Payment Agreement, it would not have purchased any participation interests in Lease Financing.

WHEREFORE, Plaintiff, MB FINANCIAL BANK, N.A. demands judgment in its favor and against Defendants, Marshall Investments Corporation, Marshall Financial, Inc., The Marshall Group and Marshall BankFirst and against Defendant CIT Group/Equipment Financing, Inc.: (a) awarding MB its compensatory damages in an amount to be proven trial; and (b) awarding MB such other and further relief as it deems appropriate.

## COUNT IV – CIVIL CONSPIRACY
### (Against CIT and the Marshall Entities)

149.    MB adopts and incorporates its allegations in paragraphs 1 through 112 of this Third Amended Complaint as though fully set forth herein.

150.    The Marshall Entities and CIT agreed that they would not disclose to MB or to any other participants or potential participants the existence of the allegations of fraud made by the Whistleblower, the subsequent investigation performed into those allegations, the results of that investigation.  The Marshall Entities and CIT further agreed that they would not disclose to

MB or to any of the other Participants the nature and existence of the Excess Payment Agreement and the fact that monies being invested by MB were being kickbacked to Krones.

151.    The failure to disclose such material information to MB was an unlawful act, which the Marshall Entities and CIT agreed together that they would commit.

152.    The Marshall Entities and CIT agreed to keep this information confidential because they knew, or should have known, that disclosure of this information to MB and to other potential participants would result in MB deciding not to participate in the Lease Financing.

153.    The Marshall Entities and CIT knew, or should have known, that their agreement to keep this material information confidential would injure MB by exposing MB to greater risk than MB would otherwise have by purchasing a participation interest in the Lease Financing. Indeed, it is now undisputed that MB has suffered losses in excess of $8 million that they would have avoided if they did not purchase any participation interests in the Le Nature's Opportunity.

154.    Both the Marshall Entities and CIT made concerted efforts in connection with their plan to keep this material information confidential from MB and other actual and potential participants.

155.    As a result of the Marshall Entities' and CIT's joint decision keep material information confidential and not disclose such information to MB, the Marshall Entities and CIT engaged in a civil conspiracy.  As a result, MB has suffered compensatory damages in excess of $8 million.  If MB had been made aware of these allegations of fraud, it would not have purchased any participation interests in the Le Nature's Loan.

WHEREFORE, Plaintiff, MB FINANCIAL BANK, N.A. demands judgment in its favor and against Defendants, Marshall Investments Corporation, Marshall Financial, Inc., The Marshall Group and Marshall BankFirst and against Defendant CIT Group/Equipment

Financing, Inc.: (a) awarding MB its compensatory damages in an amount to be proven trial; (b) awarding MB punitive damages; and (c) awarding MB such other and further relief as it deems appropriate.

### COUNT V – CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES
#### (Against CIT and the Marshall Entities)

156.     MB adopts and incorporates its allegations in paragraphs 1 through 112 of this Third Amended Complaint as though fully set forth herein.

157.     The Marshall Entities and CIT each committed a deceptive act or practice by failing to disclose the material information described in detail above to MB.

158.     The Marshall Entities and CIT intended for MB to rely on the absence of this material information in MB's decision to purchase a participation interest in the Lease Financing.

159.     The Marshall Entities' and CIT's deceptive conduct occurred in the conduct of a trade or commerce.

160.     MB suffered actual damages that were proximately caused by the deceptive acts and practices committed by the Marshall Entities and CIT.

161.     The deceptive act or practice committed by the Marshall Entities and CIT is a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. (the "Act").

162.     Under the Act, MB is entitled to seek and recover its actual damages, punitive damages and its reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff, MB FINANCIAL BANK, N.A. demands judgment in its favor and against Defendants, Marshall Investments Corporation, Marshall Financial, Inc., The Marshall Group and Marshall BankFirst and against Defendant CIT Group/Equipment Financing, Inc.: (a) awarding MB its compensatory damages in an amount to be proven trial; (b)

awarding MB punitive damages; (c) awarding MB its reasonable attorneys' fees and costs; and (d) awarding MB such other and further relief as it deems appropriate.

**COUNT VI – BREACH OF CONTRACT**
**(Against the Marshall Entities)**

163.    MB adopts and incorporates its allegations in paragraphs 1 through 112 of this Third Amended Complaint as though fully set forth herein.

164.     MB and the Marshall Entities, by and through Marshall Investments Corporation entered into the Bank/MIC Participation Agreement, which is a valid and binding agreement.

165.    Paragraph 8.2 of the Bank/MIC Agreement specifies that it shall apply to and inure to the benefit of the parties' respective successors.

166.    MB performed its obligations under the Bank/MIC Agreement by paying Marshall Investments $5,000,000 for a 16.39344262% participation interest in the Lease Financing.

167.    The Marshall Entities breached Paragraph 3.1(d) of the Bank/MIC Agreement by failing to disclose to MB the "tip" received by the Whistleblower and the subsequent investigation of the "tip" performed by CIT.  This information clearly falls under the category of information that was "necessary" for MB to perform its credit analysis and make its investment decision.    Accordingly, the Marshall Entities were contractually obligated to disclose this information.

168.    The Marshall Entities also breached Paragraph 3.2(i) and Paragraph 4.5(b) of the Bank/MIC Agreement by failing to notify MB that Le Natures had defaulted under the terms of the financing agreements by making material misrepresentations to both the Marshall Entities and to CIT regarding the actual cost of the bottling equipment.

169.    The Marshall Entities have also breached Paragraph 6 of the Bank/MIC Participation Agreement by failing to indemnify MB for any losses, claims, damages, liabilities, or other expenses incurred by MB as a result of any breach of the Bank/MIC Participation Agreement by the Marshall Entities.

170.    The foregoing breaches of the Bank/MIC Participation Agreement have caused MB to suffer damages in excess of $10 million.

WHEREFORE, Plaintiff, MB FINANCIAL BANK, N.A. demands judgment in its favor and against Defendants, Marshall Investments Corporation, Marshall Financial, Inc., The Marshall Group and Marshall BankFirst: (a) awarding MB its compensatory damages in an amount to be proven trial; (b) awarding MB its reasonable attorneys' fees and costs; and (c) awarding MB such other and further relief as it deems appropriate.

## COUNT VII – BREACH OF CONTRACT
### (Against CIT)

171.    MB adopts and incorporates its allegations in paragraphs 1 through 112 of this Third Amended Complaint as though fully set forth herein.

172.    MB and CIT entered into the Bank/CIT Participation Agreement, which is a valid and binding agreement.

173.    MB performed its obligations under the Bank/CIT Participation Agreement.

174.    Pursuant to Paragraph 5.1 of the Bank/CIT Participation Agreement, CIT agreed to be MB's fiscal agent in connection with the administration of the Lease Financing.  In administering the Lease Financing, CIT agreed that CIT would exercise the same degree of care on behalf of MB as it normally exercised in managing its own affairs with respect to leases or financing transactions in which no participation interests were sold.  *See* Ex. B at ¶ 6.

175.    CIT breached the Bank/CIT Participation Agreement by failing to disclose to MB both the "tip" it received from the Whistleblower regarding the overpriced equipment and the subsequent investigation of the "tip" CIT performed, including its communications with Le Natures and Krones regarding the "tip."   This information was clearly critical to MB's credit analysis and MB had no ability to obtain this information through its own due diligence efforts.

176.    CIT similarly breached its contractual duty of care as a fiscal agent to MB by failing to disclose the Excess Payment Agreement between Le Natures and Krones, and CIT's willing assistance in allowing MB's funds to be kicked back to Le Natures through Krones. Moreover, as MB's agent, CIT had an obligation consistent with its contractual duty of care to disclose this material information to MB.

177.    CIT also breached Paragraphs 5.5 and 7.3 of the of the Bank/CIT Agreement by failing to notify MB that Le Natures had defaulted under the terms of the Lease Financing by making material misrepresentations to both the Marshall Entities and to CIT regarding the actual cost of the bottling equipment.

178.    The foregoing breaches of the Bank/MIC Participation Agreement have caused MB to suffer damages in excess of $10 million.

WHEREFORE, Plaintiff, MB FINANCIAL BANK, N.A. demands judgment in its favor and against Defendant, CIT Group/Equipment Financing, Inc.: (a) awarding MB its compensatory damages in an amount to be proven trial; (b) awarding MB its reasonable attorneys' fees and costs; and (c) awarding MB such other and further relief as it deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, MB hereby demands a trial

by jury on all issues.

MB FINANCIAL BANK, N.A.

By:  */s/ Richard A. Saldinger*_____
        One of its attorneys

Richard A. Saldinger (IL Id. No. 6209930)
S Jarret Raab (IL Id. No. 6294632)
SHAW GUSSIS FISHMAN GLANTZ
   WOLFSON & TOWBIN LLC
321 North Clark Street, Suite 800
Chicago, Illinois  60654
E-Mail: rsaldinger@shawgussis.com
(312) 541-0151

**OF COUNSEL:**
Gretchen L. Jankowski
BUCHANAN INGERSOLL & ROONEY PC
301 Grant Street
One Oxford Centre, 20th Floor
Pittsburgh, PA  15219
E-mail: gretchen.jankowski@bipc.com
(412) 562-8800